### In re GLOBAL CROSSING, LTD. SECURITIES LITIGATION.

**Howard B. Thompson, et al., Plaintiffs,**

v.

**Gary K. Winnick, et al., Defendants.**

**No. 02 Civ. 910 GEL, 03 Civ. 8503 GEL. 02 MDL 1472.**

United States District Court, S.D. New York.

Dec. 4, 2003.

---

*OPINION AND ORDER*

LYNCH, District Judge.

The use of the courts as a weapon in political rivalries has a sufficiently long pedigree in the United States that it can be regarded as almost customary, but it is a sorry custom indeed, and one that, as Hamlet says, is "more honored in the breach than the observance."[1] In this action, each party accuses the other of seeking relief in this Court not in good faith but for political reasons. Adopting the sentiment, if not the vehemence, of another Shakespearean character,[2] the Court declines the invitation to adjudicate what is essentially a political feud.

Plaintiffs, shareholders of the bankrupt telecommunications company Global Crossing, Inc. ("GC"), filed this action on May 6, 2002. Unlike the many other shareholders who filed similar actions seeking reimbursement for losses allegedly attributable to the artificial inflation of GC's stock price by optimistic accounting practices, plaintiffs in this case, represented by lawyers associated with an advocacy group called Judicial Watch, spurned the obvious causes of action under the federal securities laws and the usual list of deep pocket defendants such as underwriters and accounting firms, and instead took the rather original approach of suing the usual GC insider defendants along with a group of persons they identified for short as the "Corrupt Politicians"—a group of political figures including former President Clinton and Terry McAuliffe, an official of the Democratic Party—on a sweeping conspiracy theory based on California state law. Though the complaint was accompanied by a certain amount of public relations ballyhoo portraying it as a major effort to clean up "corporate, legal and political corruption,"[3] the case has now been dismissed by the Court as against defendant Clinton on grounds of absolute presidential immunity,[4] and withdrawn by the plaintiffs as against all other parties, ostensibly because "limited resources and the complexities of proceeding in an action that had been transferred and consolidated with numerous other cases caused Plaintiffs to reassess their litigation goals and strategies." (P. Mem. 6.)[5]

Not content with the total dismissal of all claims against him, defendant McAuliffe seeks Rule 11 sanctions against one of plain-

---

1. *Hamlet,* act. I, sc. 4. Contrary to common understanding, what Hamlet means is that not that the custom he is referring to (drunken carousing) is more often breached than observed, but that it is more honorable to breach the custom than to observe it.

2. Mercutio—who, upon receiving a mortal wound in a duel growing out of a feud between rival families, calls down "a plague o' both your houses." *Romeo and Juliet,* act III, sc. 1.

3. Defrauded Global Crossing Shareholders Sue Officers of Global Crossing, Arthur Andersen, Former Sec Def William Cohen, DNC Chair Terry McAuliffe, Honk Kong Billionaire Li Ka-Shing, Bill Clinton, and Others (May 7, 2002

Press Release), *at* www.judicial-watch.org/1808.shtml; *see also* Global Crossing Linked with Fraud, Conspiracy, The Washington Times, May 10, 2002 at C9.

4. *Thompson v. Li Ka Shing,* No. 02 Civ. 8503(GEL), 314 F.Supp. 172, 2003 WL 1535884 (S.D.N.Y. Mar. 24, 2003).

5. Apparently it was a surprise to plaintiffs and their legal advisers both that rooting out the campaign finance corruption so deeply imbedded in our election system would take substantial resources, and that a lawsuit alleging fraud at GC would become part of a tidal wave of similar cases.

tiffs' lawyers, Larry Klayman. Although Klayman did not himself sign the complaint in the case, the parties appear to agree that as the Chair and General Counsel of Judicial Watch, he played a significant role in bringing the suit; at least, as will appear shortly, plaintiffs assert that Klayman's approval was required to withdraw the action. McAuliffe argues that plaintiffs' imaginative legal theory and aggressively inferential factual allegations are totally without a good faith basis, and that the complaint was simply a vehicle to smear McAuliffe, a political opponent, from behind the shelter of immunity from libel suits.[6]

Klayman's primary argument is that sanctions are inappropriate because plaintiffs come within the spirit, if not necessarily the letter, of the "safe harbor" provisions of Rule 11. Under Rule 11(c)(1)(A), a motion for sanctions may not be filed "unless, within 21 days after service of the motion ..., the challenged ... claim is not withdrawn or appropriately corrected." Stripped of double negatives and other infelicities of phrasing, the rule permits a party to escape sanctions by withdrawing an otherwise sanctionable filing within 21 days after being put on notice by the opposing party that sanctions will be sought. It is undisputed that McAuliffe served his motion on plaintiffs' attorneys on June 20, 2003, and that on July 10, 2003 (within the 21-day period), plaintiffs' counsel wrote to McAuliffe's lawyer saying that Klayman was away in Europe, and seeking an extension of the 21-day safe harbor period until Klayman had an opportunity to review the motion. Because McAuliffe's primary attorney is an equally busy fellow who was also traveling at the time, this letter apparently went unnoticed within his firm, and at any rate was not responded to, until July 16, 2003, when McAuliffe sought permission from the Court (necessary because proceedings in this case were stayed pending filing of a consolidated amended complaint in the broader GC case) to file his sanctions motion.

On the very next day, plaintiffs wrote again to McAuliffe's counsel, who was still out of the office, offering to withdraw the action against McAuliffe. (Apparently, even in Klayman's absence, plaintiffs had been engaging in the reassessment of their resources and strategy referenced above.) McAuliffe rejected this offer on July 24, but in a telephone conference with the Court on July 30, plaintiffs nevertheless graciously agreed to withdraw all remaining claims against all defendants, and the case was promptly dismissed in its entirety, without McAuliffe ever having been obliged to respond to the complaint. In the same conference, McAuliffe agreed to consider withdrawing the sanctions motion, and the Court directed him to advise within a week whether he intended to withdraw or pursue the motion. On August 12, 2003, McAuliffe advised that he would not withdraw the motion.[7]

McAuliffe argues in response that since the complaint was not withdrawn until July 30, a full forty days after Klayman was notified of his intention to seek sanctions, Klayman cannot seek shelter in the safe harbor, and that the Court is therefore entitled, or even obliged, to consider the merits of McAuliffe's motion. He argues further that this literal and technical reading of Rule 11(c)(1)(A) is in the interests of justice in this particular case, not only because the plaintiffs' allegations against McAuliffe were sanctionable on the merits, but also because the combination of Klayman's record of prior misconduct in other matters and the political motivation of the original filing demonstrate that it is Klayman's *modus operandi* to file frivolous lawsuits, use them as a basis for publicizing baseless allegations, and then

---

**6.** No doubt without any intention of smearing Klayman in turn, McAuliffe takes the opportunity to include in his papers a detailed account of what he contends is Klayman's impressive record of judicial sanctions and reprimands. (D. Mem. 13–14 & n. 2.)

**7.** In keeping with the spirit of this litigation, Klayman argues that this belated notice renders McAuliffe's motion "untimely" and deniable on this ground alone. (P. Mem. 9–10.) The Court declines to descend to this level of pickiness about its own directives. The motion was long since timely made and had never been withdrawn. Counsel's failure to advise the Court of its intentions within the period set by the Court constitutes at most rudeness to the Court, and not a ground for denying a properly-made motion.

quickly withdraw into the Rule 11 safe harbor when confronted with his perfidy. Klayman, in reply, argues that McAuliffe is merely pursuing a political vendetta against *him* by making frivolous sanctions motions even after the complaint in question was withdrawn.

Plaintiffs' complaint is, to say the least, unusual. Whether or not their legal theory is frivolous as a matter of state law, it is noteworthy that the lead plaintiffs seeking redress for the GC shareholder class have not found room for plaintiffs' theories in their 428–page, 1092–paragraph amended consolidated complaint. Moreover, plaintiffs' allegations against McAuliffe nowhere present any plausible basis for believing that McAuliffe knew of or wilfully assisted the alleged financial improprieties at GC. Plaintiffs' immediate retreat when confronted with the sanctions motion lends further credence to McAuliffe's contention that plaintiffs and their lawyers were more interested in making splashy allegations against McAuliffe in the press than in proving them or seeking actual relief in court.

At the same time, Rule 11 sanctions would require a finding that Klayman (assuming that he, the only party against whom sanctions are sought, can be sanctioned although he is neither a party nor the attorney who signed the complaint) was or should have been aware that the plaintiffs' claims were not "warranted by existing law," or that the factual allegations of the complaint were not "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Rule 11(b)(2), (3). McAuliffe would have the Court engage in this complex inquiry notwithstanding that the complaint was withdrawn while proceedings remained stayed and before an answer was required, and that plaintiffs' effort to come within the literal language of the safe harbor provision was apparently frustrated only by the fortuity of the travel schedules and communications difficulties of the lawyers involved.

The Court is sympathetic to McAuliffe's claims that the safe harbor provision allows a lawyer with an ulterior motive to launch sneak attacks from a protected inlet. But it declines the invitation to use Klayman's purely fortuitous technical failure to make it back to port in time to embark on its own attempt to determine just how frivolous a dismissed lawsuit might have been. Similarly, it declines the opportunity to arbitrate which party's actions have diverted judicial resources for political ends more egregiously – Klayman's attempt to pillory McAuliffe, or McAuliffe's attempt to score points against Klayman by hoisting him on his own lawsuit. This is not a case in which the victim of the alleged reputational attack is helpless to defend himself without judicial intervention. McAuliffe is a prominent public figure, who should be accustomed to the mudslinging endemic to the political world, and who commands substantial resources of funding and access to publicity to refute such attacks.

The plaintiffs have withdrawn their attempt to use the GC litigation as a vehicle for investigating or promoting their vision of political misconduct. Rule 11 precludes sanctions motions when a lawsuit, however frivolous, is withdrawn within a limited time after the demand of the adverse party. Plaintiffs certainly complied with the spirit of that provision, and indeed, to all practical purposes they did so within the prescribed period. It is time for the GC litigation to focus on the more substantial claims of plaintiffs who allege they have been aggrieved by financial fraud, and who seek the kind of redress courts can provide, without further distraction.

The motion for sanctions is denied.

SO ORDERED.